To the 7th case this morning, Qin Sui Yuan v. Loretta Lynch Good morning, Your Honor. Joshua Bourdavid on behalf of Mr. Yuan  Mr. Yuan was persecuted on account of his resistance to Chinese coercive family planning policy. The immigration judge's negative credibility determination was predicated upon an erroneous reading of the record and a failure to consider that testimony has actually occurred. I'll start with what the judge found to be most important, which was the alleged discrepancies between the type of harm suffered and the treatment Mr. Yuan received at the hospital over the course of two months. The immigration judge explicitly and specifically stated that Mr. Yuan never testified that he received a blood transfusion or surgery. However, the 11th Circuit's reasoning in Cuvite Dio is highly relevant here. That is to say, we're parsing words. We're talking about two different possible interpretations of words. And the words that Mr. Yuan said were never actually considered or analyzed whatsoever by the immigration judge. That is, specifically, Mr. Yuan, on page 327, was asked if he had just received an IV and other minor treatment. And he said, yes, at the beginning, or IV and stitches. And he said, at the beginning. And then he began to discuss x-rays, crushed bones. On page 330, very importantly, Mr. Yuan was again asked about the treatment he received. And he said, I received an IV with protein because of the loss of blood. He never said the words blood transfusions. But the immigration judge never considered whether that, in layman's terms, meant a blood transfusion. Proteins because of the loss of a lot of blood. So this is not an instance where the immigration judge considered that statement and said, well, I dismiss it and find that doesn't mean blood transfusion. The immigration judge simply didn't consider it, didn't mention it, didn't discuss it. Nowhere in the immigration judge's decision was there a discussion of the word proteins. Whether that was Mr. Yuan, an individual with a fifth grade education, that was his way of explaining a blood transfusion. Similarly, on page 361, Mr. Yuan said specifically, on my hand, when they, referring to the police, cut me, they cut the vein. So they, referring to the doctors, have to open up and find the veins. He never said the word surgery. But again, the immigration judge gives no consideration whether this is a layman's description of surgery. Again, no mention whatsoever of saying the doctors cut him open and had to find the veins. And this description is entirely consistent with a description of a surgical procedure, which would therefore match the medical records that were provided, which indicate he received a blood transfusion as well as surgery. Mr. Bardo, that I gather everybody's treating the medical records is reliable here, right? Yes, Your Honor. And I'm trying to think of any reason a person who's been beaten up, getting that abusive treatment, and then seeking asylum in the United States would have for minimizing the extent of the treatment he received. Correct. Can you think of any? None at all, Your Honor. And going to the medical records. Did the government make the argument that the immigration judge bought? I'm sorry? Did the government make the argument that the immigration judge bought, that is, that there was an inconsistency? Well, there certainly was confusing parts of his testimony. I won't dispute that. And the government argued that he was inconsistent, and the immigration judge found that he was not credible. I mean, specifically on this issue, that is, he didn't have surgery, he didn't have a transfusion, or he did. No, the government defended the immigration judge's decision, but this was never specifically addressed in closing arguments or anything like that before the immigration judge. So the immigration judge, again, the key is not that he balanced this testimony or weighed this testimony and analyzed it and said, well, I find this is not a reference to surgical procedure. I find that describing I need proteins because of blood loss is not a reference to a blood transfusion. The immigration judge said he never mentioned blood transfusion and he never mentioned surgery, and therefore didn't analyze this specific testimony. The same goes also with the error of the board. And this was all being translated, too. Yes, Your Honor. And what Mr. Yuan said on brief to the board, on appeal, was he didn't know these words. He didn't understand these words. He didn't know the Chinese word for surgery, and that was what was raised in the brief to the Board of Immigration Appeals. What's his level of education? Fifth grade or sixth grade education. I believe he had a total of five and a half years of education. It's on, I believe, around page 890 is where he lists his, in that range, I'm not certain of that exact page, but his asylum application, which is where he lists his education. So even setting aside the language barrier, the concept of blood transfusion or the certain terminology of blood transfusion, that precise terminology may well not have been known to him. Correct, Your Honor. And so seizing on that as a basis for an adverse credibility finding is extraordinary on this record, it seems to me. It's easily explained by the lack of education and the language difficulty. We would agree, Your Honor, and that's also why we would highlight the fact that when asked on page 327, again, this is the first time he's discussing the treatment he received, did you just receive stitches and an IV? And he says, at first. And then if you read, you follow his testimony, he then continues to describe needing X-rays. He talks about the vein, the nerve being damaged, the bone being crushed. This is where he's trying to describe all of the things that happened. And, again, this is treatment that he received over the course of two months. And it doesn't appear to be in doubt that he's alleged consistently that he was in the hospital for two months. And it would not make sense, as the judge found, ironically, that it doesn't make sense that he would only receive an IV and stitches yet need to be hospitalized for two months. But that's obviously explained by the fact that he needed these additional treatments and he had nerve damage. And, in fact, described then needing physical therapy over the course of an additional six months after he was released from the hospital. The troubling aspect of this case, for me anyway, is the last of the inconsistencies that the agency faced a decision on, and that is his testimony about where his brother is. And that's certainly not technical in any sense of the word, like a blood transfusion is. The honest explanation, which I think he eventually gets to, is his brother's undocumented and he didn't want his brother's whereabouts to be known. He didn't want to expose a relative who's in the United States to potentially going through what he's going through. So he read, is, very narrowly. Yes. But I would assert that that inconsistency, I understand it as troubling that he would do that. The first point is that we cannot be certain that the immigration judge would reach a negative credibility determination on that basis alone. How do we scrub the other errors from the findings? That basis alone, at the very least, would need a remand to determine whether him providing inaccurate information about the whereabouts of his brother would be sufficient to reach a negative credibility determination. And secondly, while the REAL ID Act allows for an immigration judge to base a negative credibility determination on any inconsistency, it still needs to be grounded in the record and the record needs to be considered as a whole. Where you have voluminous medical records, you have fine receipts which went unchallenged, notices from the Chinese government which provided statements from his parents, statements from his sister. We have all this information contained in the record. Considering as a whole, I would submit that providing inaccurate information about the whereabouts of an undocumented brother would be insufficient to reach a negative credibility determination. Unless the court has any further questions, we'll just reserve the remaining time. Thank you, counsel. Thank you. Mr. Byler? If I may please the court, on behalf of the respondent. So there are four bases for the adverse credibility determination, any one of which is determinative in this case. I wanted to start with the conflicting evidence in the record. It's conflicting on the face about whether he was harassed in his workplace. And this gets away from any sort of confusion about medical terms or anything of that nature. On page 1076 of the record in his addendum to his asylum application, petitioner stated that the family of planning officials continued to harass me by coming to my workplace and questioning me there as well. And he goes on to provide a detail of an argument that he had with them at work. Three times in the record in his testimony before the immigration judge, he said unequivocally that that did not happen. At page 347, the judge said, okay, again, did you speak to the family planning office at your workplace? Answer, no. Okay, now in your statement it says that the agents continued to harass me by coming to my workplace and questioning me there. Did this happen, yes or no? In which he answered, no. This goes to the very heart of his claim as to what kind of persecution he suffered in China. The second contradiction that's just clear by the face of the record is that harass you, what does that mean? Sorry, Your Honor, I guess the distinction I was drawing was they came there questioning me there as well versus I did not speak to them in my workplace. That's the juxtaposition I would present to the court. His account, the testimony was that they came to his workplace and asked about him, correct? To his boss, yes, Your Honor. Right, okay. Yes, but again, that doesn't clear up this contradiction about them questioning him at his workplace. The second contradiction that's on the face of the record is about his brother. Page 333 of the record, do you live with your brother? Answer, no. Then the judge reminded Petitioner that he's under oath. Sir, you are sworn. You are sworn to tell the truth. Answer, yes. Then on page 336, where does he live then, sir? Answer, yes, in Indiana. Question, with you? Answer, yes. So this concession of the lie which Petitioner's counsel has admitted to is sufficient to hold up. It could be, but we also have the immigration judge telling us that the most important consideration was the testimony about the extent of his medical treatment. Is it the government's position, first of all, that this beating did not happen? Your Honor, it's our position that we don't know what happened based on the adverse credibility determination. You described it in your brief as a scuffle. Do you think that's an accurate description? Like I said, we're not sure. I know that he showed scars to the judges on his hand and on his head. So the inquiry, though, is whether the attack happened on account of a protected basis. In this case, it's a critical opinion. Is it your contention that there was some other reason for it? It's our contention that we don't know what, based on the adverse credibility, what the motivation was. With respect to this discrepancy that the immigration judge found most important, I'm trying to imagine, as I asked Petitioner's counsel, what incentive he would have had to, if he were dishonest, he would have had to minimize his treatment. I don't think he had. It's hard for me to speculate about that, too. On this issue, I would point your attention to his contradicting statements on redirect. So how this case unfolded is on direct and in his statements. He didn't make any explanation of the medical treatment he received. We have, of course, the hospital bill. So then on cross-examination, government counsel asked him about it, and then we have this exchange. And then on redirect, his counsel tried to rehabilitate his testimony. And I think that the inconsistency I would point your attention to is on page 359 of the record on redirect. Where Petitioner first tells his counsel that he did receive a blood transfusion, or did receive blood, not transfusion, did receive blood, and then second, on the same page, said, I can't remember if I received blood. So I would point your attention to that on page 359 of the record. So that basis within his own testimony regarding this. Is there any doubt that he did receive blood transfusions in the medical records? Not in the medical record, no, Your Honor. So, I mean, I can understand if somebody exaggerates the severity of the injuries and the extent of the medical treatment in order to try to strengthen an asylum claim. I'm just mystified in this one. Well, and I think the immigration judge was as well, and that's why they continued to ask these questions about why there was these inconsistencies. The inconsistencies continued into redirect. And the other thing I'll say is I think he did. So in this court's case. Well, counsel, let me back up just a minute. There was an indication that the interpreter was having trouble understanding one. That was a previous interpreter, Your Honor, who they, so they had a whole set of hearing. Right. And then they, at the end, the immigration judge and the interpreter had a discussion, determined that that interpreter was having a hard time understanding. So they set that entire testimony aside. They set for a new case. And two years later they found one that could understand him? Well, Your Honor, I would point your attention to, so the immigration judge was very careful with the second interpreter to make sure that the understanding was there. So if you look at page 262 of the record, the judge specifically asked the petitioner, do you understand him? And he said yes. Was that Judge Minicore or Judge Perez-Guzman? This is the judge who took the immigration. Well, there were several. Right. This is the last immigration judge who issued the opinion, who took the most recent. And the last one was Perez-Guzman. And then on 258 of the record, again, asked our atoning petitioner, if you don't understand the question, sir, please just say I don't understand. So I think the record shows that they were very cognizant of some translation, that there could be translation issues. But nowhere in this testimony, the second testimony, did petitioner say, you know, this translation isn't working, I can't understand. There was some issue with the volume at which petitioner was speaking to the translator, which the judge addressed to make sure that that free flow of information could continue. The problem is that it can be very, very difficult for the petitioner in such a situation to even know whether there's a translation problem. It could be, Your Honor. And that's why I did my best to show you these very stark contrasts on the record. And especially with whether they came to harass him at his workplace, that question was asked in three different ways at three different times. The answer was always no. He always contradicted his previous statement. And like I said, that goes to the very heart of his asylum claim, because he was trying to show why the family planning officials were going to extra legal means to persecute him. And so that's the very heart of their motivation for attacking him. I gather you're not really relying on the confusion about how exactly he got to the hospital. That's a pretty tough ground for this credibility finding. One of the four. I think it's the weakest of the four. I think the reason why the brother, so the immigration judge was asking where your brother is, could he come. And I think one of the reasons is he could have cleared that up. He was an eyewitness to the attack and could have cleared that up. Sure. There is. But, yeah, that one is a little more difficult because of the way the words that were used by the family in the letters. I don't think the immigration judge was wrong to look at that, but that's not the only. You look at the record as a whole, we have these three strong conflicts that I pointed your direction to. And so we would ask that you uphold the average credibility determination. At any point, just a couple other questions. Sure. At any point did the immigration judge argue that any one of these four was independently enough? Did he assert that, or she? I don't think she said it explicitly, or he said it explicitly, but he did cite the REAL ID Act, which says that one inconsistency is enough. Legally it's enough. The question is factual. And then if we were to find the credibility finding was arbitrary and capricious in this case, should we go ahead and address the corroboration point or leave that for remand? I think that would be left for remand. Thank you. Thank you, Your Honor. How much time? You have two minutes. Your Honor, just to answer your last question, I would also agree that the corroboration issue should be left for remand in the event the credibility determination is found to be arbitrary and capricious. But I would take it one step further, and I would state that even if the credibility determination was found to be sufficiently warranted in the record, remand would still be required for the corroboration issue. The Board of Immigration Appeals declined to address the issue of whether the corroboration was sufficient on appeal because they said the credibility determination was outcome dispositive. And while this Court in Abrams said that an immigration judge can require corroboration for otherwise credible testimony, the opposite is also true. That is that corroboration can rehabilitate otherwise incredible testimony. In this instance, the immigration judge did not discuss many of the corroborating documents, and we would assert improperly dismissed some of them for mistaking the facts. For example, Mr. Yuan explained that he is no longer in touch with his ex-girlfriend and therefore couldn't get a letter from her. But he did also get documentation showing that they were fine. He got documentation showing that his ex-girlfriend was required to report for a pregnancy checkup, and he received other medical documentation that was not mentioned or discussed or even in any way addressed by the immigration judge as to whether or not it rehabilitated Mr. Yuan's otherwise credible testimony, unless the Court has... Could you address the question about workplace questioning? Yes, Your Honor. We addressed it in our brief, and I'm happy to address it to Your Honor right now. Mr. Yuan explained that the statement, if you look at the statement in his asylum application, which is on page 1076 of the record, where he mentions that there was this workplace harassment, it comes in a paragraph dealing with the harassment that actually occurred at his home, and the reference to him also having issues at his workplace was a digression from the description of the events that occurred at his home. The one sentence, though, seems to be rather specific about that happening at work. It does. It certainly can be read either way. The actual sentence is that he's talking about his home, they continue to harass me by coming to my workplace and questioning me there as well. And so what he's saying is that they went and talked to his boss and asked questions about his boss, but the actual confrontation between him and the officials in that paragraph that's being discussed is about the confrontation that occurred in his home. And that's why when he was describing it on testimony, he said, No, they just harassed me in my workplace by talking to my boss. That's what I'm referring to. But the actual confrontation occurred at my home. Thanks. Unless the court has further questions. Thank you. Thank you very much. Thanks to both counsel. The case is taken under advisement.